| JACKIE N. MULLINAX, | ) | |
|---|---|---|
| | ) | |
| Plaintiff/Appellee, | ) | Appeal No. |
| | ) | 01-A-01-9803-CH-00137 |
| v. | ) | |
| | ) | DeKalb Chancery |
| TERRY O. MULLINAX, | ) | No. 96-149 |
| | ) | |
| Defendant/Appellant. | ) | |

**FILED**

April 23, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

## COURT OF APPEALS OF TENNESSEE

## APPEAL FROM THE CHANCERY COURT FOR DeKALB COUNTY

## AT SMITHVILLE, TENNESSEE

## THE HONORABLE VERNON NEAL, CHANCELLOR

J. HILTON CONGER
200 South Third Street
Smithville, Tennessee  37166
        ATTORNEY FOR PLAINTIFF/APPELLEE


WM. KENNERLY BURGER
SunTrust Bank Building, Suite 306
201 East Main Street
P. O. Box 1969
Murfreesboro, Tennessee  37133-1969
        ATTORNEY FOR DEFENDANT/APPELLANT

## AFFIRMED AND REMANDED

WILLIAM B. CAIN, JUDGE

# OPINION

This appeal arises out of the dissolution of the parties' twenty-three year long marriage. The trial court granted the wife rehabilitative alimony for a two-year period. The husband has appealed raising only the issue of the propriety of the lower court's alimony award. We disagree with the husband's assertion that the evidence preponderates against this alimony award, and accordingly, we affirm the decision of the trial court.

Terry Mullinax (the Husband) and Jackie Mullinax (the Wife) were married in 1975 and were divorced by final decree in 1998. During the course of their twenty-three year marriage, one child was born to the parties. This child, Bradley Mullinax, is now an adult, and he, along with both parties, were the only witnesses who testified at the divorce hearing.

The Wife testified that she initiated the divorce proceedings due to the Husband's infidelity. She claims that while the Husband had called her derogatory names for years, his unfaithfulness was what prompted the divorce. At the hearing, the Wife testified as to what she felt was evidence of the Husband's unfaithfulness. However, even at the time of the divorce hearing, the Wife stated that she still hoped for reconciliation. The parties' son testified and confirmed that, on one occasion, a woman had been at his father's home and answered the phone when he called.

The Wife, who is now 50 years old, testified that she has worked for the entirety of her adult life. She was initially trained and worked as a cosmetologist for eleven years. Before filing for divorce, the Wife had been working as an insurance/personnel benefits coordinator for ten years and was earning approximately $20,000 per year. She testified that she left this job in May of 1997 after having a nervous breakdown at which time she spent a week in treatment at Parthenon Pavilion. Even before leaving her job, she felt that her ability to perform her job had decreased in April of 1996 when her carotid artery tore. She expressed that she would love to go back to work as soon as she was able.

The Wife introduced the deposition testimony of a psychologist, John Averitt, who first saw the Wife in June of 1997 after she was discharged from Parthenon Pavilion. The Wife was referred to Dr. Averitt from Dr. Pate, a psychiatrist. At the January 9, 1998 date of his deposition, when Dr. Averitt had seen the Wife fourteen times, he diagnosed her as having a major depressive disorder that was secondary to her medical condition and to her divorce. Dr. Averitt stated his opinion as follows: "I would rate her as being impaired or disabled because of her depression, and I would say it is a permanent disability." When asked what about her condition was disabling, Dr. Averitt responded as follows:

> [The Wife] has significant problems with concentration and memory. She tends to luminate (sic) about things consistently. She luminated (sic) about her husband and the divorce. Now, she luminates (sic) about other things, her inability to focus, carry on conversations.
>
> She is very dependent, and probably was passive dependent before the divorce ever occurred. She is presently not able to live alone. Much of the time, she lives with her sisters, one of her sisters, at least.
>
> She had difficulty with sleep. Dr. Gillespie had changed her sleep medication several times to try to address that problem. She also had difficulty with a depressed affect.
>
> In my opinion, she is not able to concentrate on a job, or to deal with job stress in her current circumstances.

Dr. Averitt concluded that the Wife's prognosis was poor due to the fact that her depression was probably based on a medical condition rather than based upon the loss of marriage. Dr. Averitt testified that he referred the Wife to a psychiatrist, Dr. Gillespie, for medication management.

The Wife testified that her total monthly financial need is $1,681.07. This included a mortgage of $285 per month, an automobile payment of $324 per month and medical expenses of $100 per month for her psychiatrist and psychologist. The Wife testified that her monthly income is $735 per month from Social Security. In addition, the final decree awarded the Wife at least one piece of property with income-producing potential other than the house in which she was living. Testimony was that this property could be rented for $325 to $350 per month.

The Husband, who is 47 years old, testified that he has been employed by the DeKalb Telephone Company for the past twenty-two years. As of recently, he also holds a part-time position as an affiliate broker with a realty company. He earns approximately $30,000 a year with the phone company and an additional $5,000 to $6,000 per year for his realty work. He testified that his monthly expenses are $1,962.00.

The Husband denied the Wife's accusations of infidelity claiming that he desired reconciliation during the first months of their separation. The Husband described an increasing frustration throughout his marriage of what he asserted were unfounded charges of infidelity that dated back ten or fifteen years. Indeed, he cited this as the sole problem in the marriage. The Husband testified that this pattern of behavior on the Wife's part dated from her first marriage. He claimed that these accusations have caused an estrangement in his relationship with his son.

The Wife filed a petition for divorce and the Husband subsequently counterclaimed for the same. Prior to trial, the parties reached agreement regarding all matters of property and debt division leaving only the issue of alimony for the trial court to determine. In the final decree, the trial court found "that it is appropriate to award alimony *in futuro* to the plaintiff for purposes of rehabilitation as set out below." The court then ordered the Husband to pay the Wife alimony in futuro in the amount of $400 per month for a two-year period and stated that this was rehabilitative alimony.

Although the court describes the alimony as both "in futuro" and "rehabilitative," the language in the court's Final Decree and bench ruling indicates clearly that the court's award is one for rehabilitative alimony. Rehabilitative support is designed to accomplish a stated result, to rehabilitate an economically disadvantaged spouse, within a limited time whereas alimony in futuro continues the support that was incident to the marriage relationship. *See* Tenn. Code Ann. § 36-5-101 (Supp. 1998); Janet Richards, *Richards on Tennessee Family Law*, § 12-3, 284 (1997); *Long v. Long*, 968 S.W.2d 292, 294 (Tenn. App. 1997) (upholding the trial court's award of alimony in futuro over

husband's challenge that trial court erred in awarding wife alimony in futuro rather than rehabilitative alimony).

With regard to the different types of alimony, the relevant part of the Tennessee Code provides as follows:

(d)(1) It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). Rehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony. In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as

> monetary and homemaker contributions, and tangible and
> intangible contributions by a party to the education, training
> or increased earning power of the other party;
>
> (K) The relative fault of the parties in cases where
> the court, in its discretion, deems it appropriate to do so; and
>
> (L) Such other factors, including the tax
> consequences to each party, as are necessary to consider the
> equities between the parties.

Tenn. Code Ann. § 36-5-101 (Supp. 1998). While all of these factors are important, the most common factors are the need of the spouse requesting support and the ability to pay of the obligor spouse. *Bull v. Bull*, 729 S.W.2d 673, 675 (Tenn. App. 1987).

A trial court's decision regarding the award of spousal support is heavily fact-dependent and requires the careful balancing of many factors, including the above factors of section 35-6-101(d)(1). *Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. App. 1996). In addition, the trial court has the opportunity to observe the parties and witnesses as they testify, and it resolves many conflicts that rest on the credibility of witnesses. *Smith v. Smith*, 912 S.W.2d 155, 157 (Tenn. App. 1995). Therefore, these decisions are entitled to great weight on appeal. *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. App. 1988). Appellate review is pursuant to Rule 13(d) of the Tennessee Rules of Appellate Procedure. Accordingly, "for a support decision to be upheld, it must be based upon the proper application of the relevant legal principles and upon a preponderance of the evidence." *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. App. 1989).

As stated, the court awarded the Wife rehabilitative alimony for two years. At the close of the hearing, the court made a ruling from the bench in which it acknowledged that there was some degree of fault on the part of both parties. With regard to the Wife's ability to work, the court made the following finding:

> The Court is convinced in its mind that at this time, Mrs.
> Mullinax is unable to work. Based upon her testimony,
> based upon the testimony of Dr. Averitt, the psychologist,
> who had reviewed also the medical records of Dr. Pate and
> Dr. Gillespie, Dr. Gillespie, the psychiatrist who had been

seeing Mrs. Mullinax, and based upon the fact that she is drawing social security disability benefits. Social Security is not generally to[o] liberal in granting benefits to folks that are not disabled. Obviously, they had to make some sort of finding that she was disabled in order to do that, grant those benefits.

I don't know how much of the disability may be associated with the trauma, the emotional trauma of this divorce action, but there are numerous appellate court cases that even that type of disability, the Court has to take note of.

Anyway, the proof is to the effect that in the spring of 1996, she had a ruptured or torn carotid artery, which I'm sure contributed to her problems that she's had. She's described it as being a nervous breakdown and I believe a lay person can testify about their own condition especially you know, I think, if you've had a nerve problem.

It appears certainly by a preponderance of the evidence at this time, she's not able to work. She's got the training and the expertise when she does become able, she has ten years experience in working at Cooper Moog Industries, Cooper Industries Division. She seemed to have a very prominent job there in charge of benefit sections. She's a cosmetologist and has worked some eleven years as a cosmetologist in Woodbury. Also, she's trained as a certified nurse assistant.

So she has the ability, the training and the experience to earn a livelihood if and when she is mentally and physically able to work. I don't know if once this divorce case is over with, hopefully her emotional situation will improve.

The Court feels that this is a proper case to grant alimony in futuro for a period of two years at $400 a month. If she does not recover to the extent she is able to work, obviously within that period of time, she can petition the Court to extend the alimony. This would be considered also as rehabilitative alimony. It is the Court's opinion it will take at least that long under the circumstances for her to rehabilitate herself to get back into the work force.

I'm not really basing any of this on fault, although it is a factor for the court to consider. I have looked at all of the factors as set out in the Code, but based primary on need and ability. She has the need, in the Court's opinion, he has the ability to pay that amount.

On appeal, the Husband argues that the record does not support a

conclusion that the Wife has demonstrated a need for alimony. He claims first that the final decree reflects that the Wife received substantial assets in the division of the parties' marital estate. Secondly, the Husband disputes that the Wife has shown she in unable to work because, he claims, her medical diagnosis was not supported by competent evidence. It is the Husband's position that where the central issue of a case involves medical diagnosis and treatment, a party's pronouncement that he or she is sick may not be the basis of the court's decision.

The gist of the Husband's position is that the Wife is not really depressed and unable to work. More than once, counsel for the Husband referred to the fact that it would be better for the Wife to work than to sit at home and watch "Ricki Lake" and "dwell on her problems." On cross-examination after the Wife asserted that she could not do her job, the Husband's attorney countered "that is simply because you have decided that you can't do it." In spite of the fact that the Husband does not believe the Wife, the trial court did. "[O]n an issue which hinges on witness credibility, [the trial court] will not be reversed unless, other than the oral testimony of the witnesses, there is found in the record clear, concrete and convincing evidence to the contrary." *Givler v. Givler*, 964 S.W.2d 902, 905 (Tenn. App. 1997) (*quoting Tennessee Valley Kaolin v. Perry*, 526 S.W.2d 488, 490 (Tenn. App. 1974)).

We find that this record fully supports the trial court's decision to award the Wife rehabilitative alimony. In addition to the Wife's testimony of her present inability to work, the trial court relied on the deposition testimony of the Wife's treating psychologist, Dr. Averitt. Dr. Averitt opined with detail that the Wife was suffering from a major depression disorder such that she was unable to work. It was Dr. Averitt's opinion that the Wife was being honest regarding her portrayal of her condition. Moreover, there was undisputed testimony of the Wife's current financial needs as well as of the Husband's current income and ability to pay.

This record contains no grounds for concluding that the trial court misapplied the factors influencing the alimony decision. In fact, the trial court's bench ruling evidences a thorough application of the statutory factors to the

record.  We conclude that the trial court's decision was supported by a preponderance of the evidence.  We therefore affirm the award of rehabilitative alimony to the Wife.  Furthermore, we find that the costs of this appeal should be taxed against the Husband.

-9-

_____
WILLIAM B. CAIN, JUDGE


CONCUR:


_____
BEN H. CANTRELL, P.J., M.S.


_____
PATRICIA J. COTTRELL, JUDGE